Mr. Campbell is an innocent man who was convicted and sentenced to 55 years in prison due to the constitutionally ineffective representation of appointed counsel Harvey Welch. Of all the evidence that could have been presented and was not, which do you think, if you can point a finger, would have been the evidence most likely to change the outcome? I think that Tony Leonard, a witness who was called the week before in the Douglas trial, would have dismantled most of the state's case against Mr. Campbell. The state's case, remember, had no physical evidence and it consisted essentially of two things. Rita Butler's testimony that the fight began between Campbell and the victim and the testimony of two co-defendants, Johnson and Pete, who said that they didn't do it. And I guess the state also had the notion that Campbell and Shepard had a grievance between them, right, that there had been phony coke sold. Rita Butler testified to basically two things. One, that she purchased the fake crack from Mr. Campbell and that the fight began between Mr. Campbell and the victim when the victim wanted to go back. Beyond that, she didn't see much of the fight and she was even unclear about who started the fight between the two of them. Tony Leonard would have said that the fight didn't begin between Campbell and the victim, but between two other men and the victim. Tony Leonard also saw, while she named a number of men as being involved, a number of the defendants eventually charged, she saw a lineup with Campbell in it and picked someone else. And finally, Ms. Leonard would have identified state's witness Johnson, who said that he witnessed the beating from down the block and was not involved. She would have identified him as a participant in the beating, kicking the victim. She testified to all of this at the Douglas trial the week before, and of course, Mr. Douglas was acquitted. The only thing that's really left after that of the state's case is the testimony of Steve and Pete. And either Leroy or Minnie Hunter, had they been called, would have said that while Pete said that he just opened his door and witnessed the beating from there, either Leroy or Minnie Hunter would have said that he actually was a participant in the beating, beating the man with a pipe in the street. I think Minnie Hunter said she thought it was an iron pipe, and of course, they were both subpoenaed in the Douglas trial by the defense. Mr. Hunter testified, and then his wife was released from that subpoena after he testified. Along those lines, with Minnie Hunter here, we've got a procedural default problem that's pretty serious. How important is her testimony in your case, given Leonard and the other two hunters? Minnie Hunter's testimony is basically the same as her husband's. I think for context, though, it's important to realize that they didn't come together to the police to make these statements. Mr. Hunter called the police because he saw his neighbor, Steven Pete, out on the loose after he heard that the man had been beaten and had died. And Minnie Hunter was actually called by the police, and according to the police report, she was unaware that her husband had contacted them. So it's too independent. The record says that they basically didn't know each other, were talking to the police, and they both identified Mr. Pete as beating the man with a pipe in the street. Of course, we also have Aisha Hunter. She, unlike her parents who lived next door, Aisha Hunter did know Campbell. She saw him not participating in the beating that night. She's the one that called 911 that night and was not reached out to by Mr. Welch. So isn't Mr. Campbell, though, still in trouble if he's part of the melee, even if Pete was part of it too? Well, first of all, Toni Leonard would have said that she didn't recognize him as being involved at all, even though she named a number of men. She saw a lineup with him in it and didn't see him, similar to other cases of this court. In addition, the state's theory was that he both began the fight and was there throughout the fight. Rita Butler testified that he was there at the start, and then Johnson and Pete testified that they saw him sort of near the end of the fight. Toni Leonard would have rebutted that, saying that the fight didn't start with him. It began between two other men who she named, Jeffrey Dillon and Lintez Holt, and she gives a very specific account of the beginning of the fight. While Rita Butler isn't sure who threw the first punch, Toni Leonard says Lintez Holt and Jeffrey Dillon started the fight. Dillon struck first, followed by Holt. When the man, Mr. Shepard, starts fighting back, Jeffrey Dillon pulls out a gun and hits him with it. Were there any significant attacks on either the honesty or accuracy of Butler's testimony? Of Butler's testimony? In closing, there was a note that while she said that she was not planning on smoking the crack because she was clean, Officer Swan said that she actually was using at the time and he knew her to be using it, and that was noted in the closing. But beyond that, I don't think there was much that went against her. Nothing like would have happened with Toni Leonard being called and totally contradicting the story. Okay. One of the interesting features of this case is the Douglas trial. Yes. But I have to say I'm a little troubled by how much weight could or should be given to that without a very, very close study of the strength of the State's case against Douglas. I'm troubled by that, I'll just say. Well, I think that, first of all, in the Douglas trial you had physical evidence, so in some ways the Douglas trial there was more evidence against Douglas. And I think there are other cases from this court where you can compare the trials, they don't have to be exactly the same, you can compare the quality of the testimony, the quality of the State's case, and compare them, and I think that this falls into that category. We know what witnesses Welch had available to him, we know which witnesses he failed to investigate or call a trial, and we know the effect those witnesses likely would have had based on the Douglas trial. Mr. Krohn, could you address directly why you think Mr. Welch's it was too dark to identify anybody strategy was so misguided that it fell below the Sixth Amendment standard, and I guess without the benefit of hindsight. Sure. First of all, I think that too dark to see was not Welch's strategy. It's a characterization of his strategy, an unreasonable characterization both by the State court and adopted by respondent. To the extent he had any strategy, if you read his closing, it's sort of a mishmash. To the extent he had any real strategy, it was this unsupported idea of self-defense, that Shepard had a gun, and he talks about the gun being the equalizer, that no one would approach these guys unless he was armed. Even though there was no gun found at the scene, the only gun being discussed was in the Douglas trial, with which Mr. Shepard was beaten, not anything that was in Shepard's hands. So that is, in his closing, that's the only consistent through line. He mentions the lighting briefly, but without investigating any of these witnesses, without knowing what they might say, that couldn't have been a reasonable trial strategy. But isn't there some other evidence that suggests the lighting was bad? I'm remembering maybe the emergency personnel who came. There was an EMT who said that there were lights from the vehicles and that he had to use a flashlight, but Steven Pete, to the extent that we credit anything, he said there was a streetlight right in front of his house. Minnie and Leroy Hunter talk about the light bouncing off the pipe that Pete was beating the victim with. Toni Leonard identified from basically the same vantage point, though a little bit more unobstructed than Rita Butler, she identifies a number of men in that first interview. She goes on and on about who they are. She distinguishes two twin brothers, which ones out there. If Welch had read any of this and followed up on any of this, that theory would have been, to the extent it was any theory at all, would have been discredited. These were identifications of people who knew each other, by and large. Ms. Leonard identified a number of men. She was sort of walking by. She did know the men. She identified them by street name, by name, photo lineup. She also then identified Booker in an in-person lineup, but of course failed to identify Campbell in that same lineup. If I could just ask you two more quick questions before we go on. As the state court said, Johnson and Pete were already impeached. And what concerns me here is whether this was just a matter of degree and why it would have been unreasonable for the state courts to have viewed it that way. Neither Johnson nor Pete were implicated in the beating. They were arrested and charged, but their story on the stand was that they didn't do it, and that went unchallenged by Mr. Welch. And there's a jury instruction, in fact, that talks about how much you can believe someone who says they were involved in the crime, but they specifically said they weren't involved in the crime. Johnson says he's down the block. Pete says that he opens his door, sees the beating, he's in his boxers, yells at the crowd and closes his door. There was no idea at all that they were implicated in the same way that having Leroy or Minnie Hunter or Tony Leonard say that I saw the man kicking the victim, I saw the man beating the victim with a pipe. They were not implicated in that way at all. One last question, if I could. Of course. If we were to agree with you in general, could you address the choice of an appropriate remedy here as between, for example, remanding to the district court for an evidentiary hearing on these matters that I gather were not heard in the state courts as opposed to directing issuance of the writ? I believe that the record is sufficient to direct the issuance of the writ. Obviously, if the court disagrees and thinks there's any question about the fact that Welch did anything, that would be appropriate to remand for an evidentiary hearing on what, if anything, Welch did. Thank you. Okay, fine. And I will give you some rebuttal time, and please add five minutes to the state's time. Ms. O'Connell. If it pleases the court, I'm Assistant Attorney General Erin O'Connell on behalf of the respondent warden. As this court knows, there are two issues in this case, whether the petitioner has shown prejudice and whether the petitioner has shown that counsel's performance was deficient and, moreover, that the state court was itself objectively unreasonable in finding that counsel's performance was actually sufficient. But this was a case that hinged entirely on eyewitness identification. If the lawyer is going to do one thing only, shouldn't that have been to identify and interview all of the eyewitnesses? And, in other words, what possible, what possible strategic reason can there be to not interview known witnesses to a crime in a case that's based on eyewitnesses' accounts? I don't think it's possible to dispute that that would have been the best practice, that ideally an attorney would do so. The question here, though, is whether counsel's performance necessarily failed under the Sixth Amendment for his failure to do that. But they are known witnesses. I mean, we're not talking about, you know, shopping around the city of, you know, the surrounding area to find new people. It seems like the Supreme Court has divided up the question, did you conduct an adequate investigation? That's one part. That's where we are. Versus having investigated your strategic choice to call witnesses 2, 3, and 5 and not 1 and 4, okay, you know, that's certainly right in the core of the lawyer's prerogative. But we're at the first stage. He doesn't even know what they're going to say. I should step back a little bit in terms of the record really doesn't show very much about what his investigation was. And this gets back to the point of what's the appropriate remedy here. We know almost nothing about what counsel investigated, what counsel's reasons would have been for not interviewing certain witnesses. So we're kind of guessing here on a record that's incomplete. Yes, but we have to think in terms of what possible strategic reasons can there be. And I can't think of one. I can't think of a possible strategic reason not to interview no witnesses to a crime. If I could break it apart a little bit based on the different witnesses. So looking at Aika Hunter, counsel clearly had a reason for not interviewing her. She stated that she looked out of her window, that her view was somewhat obscured by her Christmas lights, and furthermore that she could identify nobody that was involved in the fight. No, but she said she saw Campbell standing near her house away from the mob. That's what she said afterward in developing a post-conviction affidavit. That's what she added. But counsel at the time of making his decision had the police report in front of him where Aika said, basically, I've glanced out. I couldn't see anybody that I knew. I don't know who did it. How long would it have taken him to follow up, though? I mean, you know, she is aware that something's happening. She doesn't deny that. I mean, really, a phone call where she might have said, oh, actually, I did see a little bit more? I agree. The police don't have time to write every last detail down in their reports, and it seems like your rule is that it's always enough to just stop with the police report, but that's a very strange position to take for defense counsel. I disagree that that's always the best way to go about it. But you're saying it's always sufficient. It's always barely adequate, let's say. Only in circumstances where counsel has a strategy that would account for it. Say we aren't going to do any independent investigation. What the police say is fine with us. That's really odd. I do think with Hunter especially that counsel was definitely justified in not questioning her just because of the limited nature of her statement and really her insistence that she didn't see anything of value. And then he also had many police reports actually dealing with Tony Leonard, from which he could have concluded that she would have been an unreliable witness no matter what. Now, counsel today has said. You're not at all worried at the fact that the police are actually on your side? We know this from Brady, we know this from all sorts of things, that you get to take essentially your opponent's account of the transaction and not test it at all with the witnesses? And that would have been a better practice. But I'm wondering if it's even adequate not to test it. In this case, I think if this court were deciding in the first instance, was counsel's performance adequate, it would be a closer question. But the court is not answering that in the first instance. The court is asking whether the state court's finding that he was adequate was an objectively unreasonable application of Strickland. And that standard is extremely difficult to meet, and it hasn't been satisfied in this case, especially given that we've been. Well, there are Supreme Court decisions, even under AEDPA, that have found ineffective assistance of counsel, and they tend to focus on areas where there's not even been an effective investigation. True. And here again, though, we don't know much at all about the investigation. We know that he only spent 110 hours preparing for trial. I swear to you, it took me 10 hours to read all of this. I just, it sort of boggles my mind. Ms. O'Connell, what struck me, you argued in your brief that once counsel decided to argue that the eyewitnesses were unable to make reliable identifications, it was reasonable to deem interviews of other purported eyewitnesses unnecessary. I don't understand, first of all, how we would have any idea how counsel made up his mind about this. Second, we have no idea if that's what counsel actually thought. And the third problem I have with that general argument here is that it seems to be once I have made up my mind, I don't want to be confused with additional facts that might come forward at trial. I have real trouble seeing how that's not deficient performance. And I think Your Honor is correct in pointing out where the record is incomplete on this issue. We don't know anything really about counsel's own strategy. We don't know much about his investigation other than what he billed for and the notations that he made. But otherwise, we really don't know a whole lot about what he was doing before trial. But even if doing this was deficient, petitioner still needs to show prejudice to get a writ of habeas corpus. And under those, even in Crisp, Crisp v. Duckworth is the main case on which petitioner relies where they found that it was ineffective not to interview witnesses named in police reports. This court nevertheless denied a writ because it found that that deficient performance was not prejudicial. And here petitioner has come forward with numerous witnesses, but when they're really examined, none of them really would persuasively undercut the state's case and demonstrate or lead to a chance of a different result, a reasonable probability. Well, that's the question, obviously. Once you change the mix of witnesses, is our confidence in the outcome that we got undermined sufficiently? That's the way the Supreme Court phrases it in Strickland, to think that there should be another go at this, basically. I mean, assuming the state chose to retry. It would be a different question if there were a number of eyewitnesses that had equal ability to observe and equal value to their testimony. But Toni Leonard, let's start with her because she's petitioner has put her forth as the best witness. She testified at the Douglas trial that 10 to 12 people were involved in beating the victim. This is in the appendix at 403. In the police reports, she was able to name four of them. This is in the appendix at 155 to 56. We know that she saw a lot of people and a lot of activity, and she could only report on a very small slice of that. So she was only able to name these four participants that she apparently knew. She didn't identify petitioner or Theotis White, who was also convicted after a trial, a jury trial. She didn't identify either of them as being even at the scene. Petitioner admits that he was there. And it's not clear to me, actually, that he is disputing Rita Butler's testimony that puts him in the middle of it. Her testimony was that it was him who sold fake drugs and really kind of instigated the confrontation. Because she paid money for the bad drugs. Okay. Well, what about Aisha Hunter's testimony to the effect that Campbell was a bystander during the fight? This was something that was developed, I think, six years after the trial. The court has to consider whether it's credible that someone who at the time of the crime said that she saw nothing of interest couldn't identify anyone. She never even mentioned to the police that she opened the door. That was the account of the police officer, correct? Right. She's never interviewed by defense counsel. We don't know that that's what she would have said in the end. I don't think that she's denied that that was what she told them. We hear so many cases where witnesses are reluctant initially to come forward, especially with the police, especially in a situation like this, wouldn't be at all surprising, right? But when pressed, she says Campbell wasn't in the fight. What she says is that even though she couldn't make out much, she saw Petitioner and Petitioner alone. Twelve feet away from her. As an individual who's standing right outside of her house that she could identify. Maybe she's right. Maybe the state could have attacked her credibility, but we don't have any indication the defense counsel even asked, right? At this point, we don't know that. That's correct. So setting aside the eyewitnesses, I think the court discussed briefly the point of Johnson and Peek, and were they impeached already? And the answer to that is that they clearly were. And in fact, the jury was aware of, with respect to Johnson, not just his criminal history, his past, but the fact that at the time he was testifying, he was incarcerated. He was awaiting trial at that time on an unrelated burglary charge. The jurors already knew a lot about Johnson's credibility. They also knew that he had reached an agreement with the state to avoid trial on a murder charge, which is something that certainly would undermine credibility. And also, counsel in his cross-examination took him point by point and said, this is your testimony today. Is that what you told police officers at the time of the investigation? And he said no. He had to admit that much of what he said was either false or misleadingly. He had blacked out quite a few details. And Peek was also impeached on both of those grounds, in terms of his motive to fabricate to avoid a prosecution for himself. And then also, his initial statement to police was that he couldn't identify anyone because they all had hoods over their faces. So that was directly contrary to the testimony that he ultimately gave, which was that he could clearly identify, for example, a petitioner as one of the individuals in the beating. Could you tell us what felony mob action is, as a crime? That is an excellent question. I'm not sure of the specific definition. I know that, in this case, the state's theory was that petitioner – it involves multiple people committing an act as a mob. And in this case, they did argue that he aided and abetted that mob action mainly by even just throwing a single blow would have been enough. That's one of Johnson's prior convictions involved? That was Peek. Peek. Right. Peek. Thank you. And that was not brought to the jury's attention, was it? That was not brought to the jury's attention. That was a juvenile adjudication for mob action. And unfortunately, we don't know the facts underlying that conviction. But, no, that was not addressed at petitioner's trial. Let me put it this way. What's the best case for Mr. Welsh's investigation having been adequate here? He read through the police reports and he interviewed the petitioner. I mean, I would presume these are all very basic tasks that a trial counsel would undertake, and he's presumed to have done so. Based on his interviews with petitioner and his review of these reports, he concluded that the conditions were not enough for eyewitnesses to make reliable identifications and that what his focus should be would be on a reasonable doubt defense, that is, that he should focus on attacking the credibility of state witnesses who were admittedly somewhat easily impeached and make that the centerpiece of his strategy. And that's ultimately what he did at the trial. And is what you just told us supported by Welsh's testimony, or is that construction? Well, we do have the presumption that he was performing as the Constitution mandates. And so, I mean, I've set forth things that certainly any competent counsel would do, interviewing his client, reading the police reports. But beyond that, there isn't much to go on here in terms of what his strategy was and his investigation. I mean, we don't know if he actually did interview these witnesses because we don't have an affidavit from him one way or the other. It would have been helpful to have an evidentiary hearing, wouldn't it? On the issue of performance, it would be helpful to have an evidentiary hearing. The prejudice question can be addressed without additional testimony. And if the court finds that the omissions that petitioners identified were not prejudicial, then there's no need for the evidentiary hearing. I do think that the record is too sparse at this point for the court to outright grant a writ on the basis that counsel's investigation was deficient. So on that question, an evidentiary hearing would likely be appropriate. All right. Thank you very much, Ms. O'Connell. So I'm giving you two minutes in rebuttal, Mr. Picard-Crone. Briefly, first, I think counsel might have misstated, I don't believe that the mob action was a juvenile adjudication. I think that Johnson had a juvenile adjudication. I believe the mob action was a felony adult conviction. Second, I think it's important to recognize Mr. Campbell was not sentenced to 55 years in prison for selling fake crack. So Butler's testimony about who she bought crack from, to the extent it's reliable, does not put him in prison for murder. Counsel said that Tony Leonard was unreliable, but she identified at her first interview, she identified at least six men who were eventually charged. In the in-person lineup, a lineup that Welch failed to attend himself, she identified one other man, Mr. Booker. She also identified Douglas as being 50 percent sure that he was involved, and yet when she saw Campbell, she picked somebody else. Aisha Hunter, while Welch did not reach out to her, Lyons' attorney did, and Lyons' attorney called her on the phone several times, met with her for an hour, and afterwards, shortly after, his client was dismissed from the case. Welch, I think Judge Rovner started by saying, you know, you would interview all the witnesses. Welch appeared to interview none of the witnesses, and as Mosley says, you can't have a reasonable strategy. There's no presumption of a reasonable strategy where you haven't actually exercised any judgment. But, of course, Ms. O'Connell argues, okay, even if we grant you defective performance, what about prejudice? I think that in addition to the, again, you look at the Douglas trial, you look at how those witnesses testified there, you look at his acquittal. The Douglas trial, in addition to the blood on his clothes, he made a statement to the police implicating him that the evidence, I believe, was stronger against Mr. Douglas than it was against Mr. Campbell. And with that, we ask you to reverse and remand for the entrance. Thank you. Thank you very much, and thank you for accepting this appointment.